FILED

MAY 2 7 2009

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUAN CARLOS ALFONSO, SR.,<br><br>Defendant. | CASE NO. 08cr2970-BTM<br><br><br>ORDER RE: MOTIONS FOR DISMISSAL, NEW TRIAL, AND DISCOVERY |

Defendant Juan Carlos Alfonso ("Mr. Alfonso") seeks dismissal of his indictment or a new trial alleging that the United States has not complied with its "Brady" obligation to produce exculpatory material. First, Mr. Alfonso contends that the Government has failed to produce or delayed producing material in the NCIC and NOMO computer data bases. The Government has now complied with this Court's order concerning materials in the NCIC data base. There is no "NOMO" computer base. None of the material produced by the Government in its filing on May 6, 2009 [Docket No. 149] appears to be exculpatory and it would not, in any way, affect the jury's verdict. Any delay in compliance with the Court's order was not prejudicial.

Mr. Alfonso also claims that the Government has failed to turn over tape recordings and evidence showing that he called the U.S. Consulate in Tijuana, Mexico prior to his arrest and told officials that Mexican law enforcement personnel were coercing him into smuggling drugs. The Government was ordered to produce any recordings or reports corroborating any such calls. The Government has, on multiple occasions, vehemently asserted that they have complied with this Brady directive. Mr. Alfonso, representing himself, sought and obtained an order from the Court authorizing a subpoena issued to the U.S. Consulate on January 16, 2009. While Mr. Alfonso had access to prior correspondence from the Consulate advising how the subpoena or a Freedom of Information Act request should be served, see, e.g., 22 C.F.R.

08cr2970

1 §172.1 et seq., he nevertheless sought to have the subpoena served on Special Agents Brian

2 Rizzo and Salvador Ochoa of the Immigration and Customs Enforcement agency, who were

3 serving at the Tijuana U.S. Consulate.

4     On January 29, 2009, prior to trial, the Court held an evidentiary hearing regarding

5 compliance with the subpoena. Both Agents Ochoa and Rizzo testified.[1] Agent Ochoa testified

6 that calls to the Consulate are not recorded and that he did not recall speaking to Mr. Alfonso.

7 Agent Ochoa also testified that he learned from Agent Rizzo that the defendant spoke to him

8 and claimed he was being coerced into smuggling drugs. Agent Ochoa testified that he did not

9 have custody or possession of any documents called for by the subpoena.

10     Agent Rizzo likewise testified that telephone calls to the Consulate are not recorded.

11 He recalled speaking to Mr. Alfonso on July 25, 2008, for four to five minutes. He testified that

12 he only spoke to Mr. Alfonso once. Mr. Alfonso claimed that Mexican officials were coercing

13 him into smuggling drugs. Agent Rizzo made a note and TECS lookout based on the

14 conversation. The Government produced these documents to the defense. Agent Rizzo

15 asserted that he produced all the documents called for under the subpoena. Agent Rizzo also

16 testified that he told Mr. Alfonso "not to violate the law."

17     At the conclusion of the evidentiary hearing, the Court found that the Government had

18 complied with the subpoena.

19     Mr. Alfonso's defense at trial was duress. Agent Rizzo testified at trial in the

20 Government's case-in-chief that he received a call from Mr. Alfonso on July 25, 2008, wherein

21 Mr. Alfonso asserted that Mexican federal officials were forcing him to smuggle drugs into the

22 United States. Agent Rizzo testified that Mr. Alfonso said they were going to frame him. Agent

23 Rizzo also testified that Mr. Alfonso did not tell him that his life was being threatened. Agent

24 Rizzo asked Mr. Alfonso why he could not come to the United States. Mr. Alfonso indicated

25 to Agent Rizzo that he did not want to leave Mexico. Agent Rizzo told him not to violate any

26 laws. Agent Rizzo testified that this was the only call he received from Mr. Alfonso.

27

28    [1]  The court summarizes the testimony based on its bench notes as a complete transcript has not yet been prepared.

2

08cr2970

1    Mr. Alfonso called Agent Ochoa at trial in his case.  Agent Ochoa testified that he did
2    not speak to Mr. Alfonso prior to his arrest.

3    Mr. Alfonso testified in his defense.  He claimed that on July 15, 2008, Mexican officials
4    attacked him and told him that he would be sent to prison in Mexico City unless he paid them
5    $20,000 or worked for them (by smuggling drugs or aliens).  Mr. Alfonso further testified that
6    he called Agent Ochoa at the Consulate and told him about the threat.  He testified that he
7    spoke to Agent Rizzo and told him that he was being framed to smuggle drugs.

8    There is no doubt that Mr. Alfonso called the U.S. Consulate and spoke to Agent Rizzo.
9    The jury heard that testimony.  Mr. Alfonso claims, however, that he also spoke to Agent
10   Ochoa.  He also alleges that the conversation with Agent Rizzo was 20-25 minutes long and
11   that both calls were recorded.  The issue here is whether any further material, such as a report
12   or recording, exists to corroborate Mr. Alfonso's claim.  The Government, through Assistant
13   United States Attorney Matthew Gardner and Agents Rizzo and Ochoa, has asserted that there
14   are no recordings or reports other than the report and TECS lookout it produced.  However, it
15   appears that, pursuant to 22 C.F.R. § 172.1 et seq. and the statements of Kay Barton, Chief
16   of American Citizen Services at the Consulate in Tijuana, the procedure available to obtain
17   records from the Consulate is by a subpoena served on the Department of State, Executive
18   Office, Office of the Legal Advisor.  Ms. Barton stated in an e-mail to Alejandro Amigo, the
19   defense investigator, that the United States Attorney must go through this same process to
20   obtain the sought-after information and records, and that she has not received a request from
21   the State Department by the United States Attorney for the alleged recordings or reports.
22   (Alejandro Amigo Decl., Attach. A, p. 3 [Docket No. 162].)  The Government nevertheless
23   strongly asserts that it has done an exhaustive search for the material Mr. Alfonso seeks by
24   utilizing Agents Ochoa and Rizzo.

25   Thus, notwithstanding 22 C.F.R. §172.1 et seq., the main issue addressed in the post-
26   trial motions appear to concern  whether Agent Rizzo had access to all available materials to
27   comply with the subpoena, and whether Mr. Gardner and his agents effectively made a
28   complete Brady inquiry and production.  If the Court leaves this issue unaddressed, it will

1   become the subject of briefing on appeal and will require the Court of Appeals to take time to
2   examine the record of multiple proceedings in this case to decide whether the Government has
3   done enough to satisfy its Brady obligation.  For two reasons, the Court has issued an order
4   directing the production of any recordings and reports of conversations with Mr. Alfonso.

5          First, given 22 C.F.R. §172.1 et seq., Agent Rizzo, despite his good faith belief, may not
6   have access to all the relevant records.  He may not have access to all the information that Ms.
7   Barton does, including whether the Consulate recorded any calls by Mr. Alfonso without Agent
8   Rizzo's knowledge.  The Government offered no evidence regarding whether Agent Rizzo
9   spoke to Ms. Barton to confirm the absence of any recordings.

10         Second, this issue will come before the Court of Appeals.  Developing a full record
11  before this Court will save the Court of Appeals time.  If the recordings and reports exist, they
12  will be produced. On the other hand, the recordings and reports simply may not exist.  In either
13  case, there is no need to trouble the Court of Appeals with an issue that this Court can resolve
14  here and now.  Since Ms. Barton has not stated whether any recordings or reports other than
15  what has been produced exist, finality and clarity dictate that the order for production issue.
16  However, the Court underscores that, at this time, there is no basis to conclude that the
17  Government has not honored its discovery obligations in this case.

18         Therefore, the Court has issued an order directing the United States Department of State
19  and Kay Barton to produce before this Court on June 1, 2009, at 9:00 a.m., all telephone
20  recordings of calls made by Juan Carlos Alfonso to the U.S. Consulate in Tijuana, Mexico,
21  during the period of July 15, 2008 to August 21, 2008, and any reports or memoranda of such
22  calls [Docket No. 163].  The Court also directs the United States Attorney for the Southern
23  District of California to use all good faith efforts to facilitate service and compliance with this
24  order.

25         Mr. Alfonso's motion for issuance of a subpoena to the State Department [Docket Nos.
26  126, 147] is, therefore, **GRANTED** as set forth above.

27         Mr. Alfonso also claims that he had ineffective assistance of counsel because his prior
28  counsel did not properly seek the above-described documents from the Consulate.  To prove

1  ineffective assistance of counsel, a defendant must show both that his counsel's performance

2  was deficient, and that this deficient performance prejudiced his defense.   Strickland v.

3  Washington, 466 U.S. 668 (1984). Mr. Alfonso has shown neither. His prior counsel sought

4  a subpoena for the Consulate's records.  Mr. Alfonso, however, made several successful

5  requests for new counsel, ultimately electing to represent himself. At the time the subpoena

6  was served on Agents Ochoa and Rizzo, Mr. Alfonso was representing himself, and he was

7  responsible for insuring proper compliance with 22 C.F.R. § 172.1 et seq.

8         Acting as his own attorney, Mr. Alfonso was in possession of communications from the

9  Consulate to his prior counsel regarding how to obtain the documents he sought. Thus, Mr.

10 Alfonso was responsible for following this procedure properly.  Furthermore, he has not

11 demonstrated prejudice as the result of any of the deficiencies he alleges. At this point, the

12 only available evidence suggests that no further documents exist, despite Mr. Alfonso's self-

13 serving belief that they do. Therefore, Mr. Alfonso has failed to prove ineffective assistance of

14 counsel.  The Court thereby **DENIES** Mr. Alfonso's motion to dismiss or for a new trial based

15 on ineffective assistance of counsel [Docket No. 148].

16        Because no proof of any failure to produce Brady material exists at this time, the Court

17 **DENIES** all motions to dismiss due to Brady violations or failure to produce discovery. (See,

18 e.g., Docket Nos. 90, 91, 98, 109, 131, 143, 145, 154, 158, 165.)

19        Mr. Alfonso additionally asks the court to grant a new trial and for other relief related to

20 new evidence he wishes to offer. To prevail on a motion for a new trial, a defendant must

21 satisfy a five-part test: "(1) the evidence must be newly discovered; (2) the failure to discover

22 the evidence sooner must not be the result of a lack of diligence on the defendant's part; (3)

23 the evidence must be material to the issues at trial; (4) the evidence must be neither cumulative

24 nor merely impeaching; and (5) the evidence must indicate that a new trial would probably

25 result in acquittal." United States v. Harrington, 419 F.3d 598, 601 (9th Cir. 2005) (quoting

26 United States v. Kulcyzk, 931 F.2d 542, 548 (9th Cir. 1991)). Here, all of the evidence Mr.

27 Alfonso now wishes to offer was available to him or could have been obtained with due

28 diligence prior to trial.

08cr2970

Specifically, Mr. Alfonso now wishes to call three additional witnesses and to introduce a receipt of payment for his call to the embassy in a new trial. First, Mr. Alfonso seeks to call Francisco Daniel Luna-Sanchez as a witness to testify that he was present when men dressed in black entered Mr. Alfonso's apartment looking for drugs. Mr. Luna-Sanchez states that he knew Mr. Alfonso as "El Tigre" and had visited his apartment 4 to 5 times. (Luna-Sanchez Decl. ¶ 1–3 [Docket No.123].). Mr. Alfonso was aware that Mr. Luna-Sanchez existed as a potential witness prior to trial, but did not seek to call him. Thus, Mr. Alfonso cannot show that Mr. Luna-Sanchez's testimonial evidence is newly discovered.

Mr. Alfonso further seeks a new trial to call as witnesses his wife and the clerk at the motel where he was staying. Mr. Alfonso was aware of any information held by his wife and the hotel clerk prior to trial and did not seek to offer them as witnesses. Mr. Alfonso, therefore, fails to show that testimonial evidence held by these witnesses is newly discovered.

Furthermore, the phone call receipt Mr. Alfonso seeks to now introduce would be merely cumulative. At trial, Mr. Alfonso offered corroborative evidence about his phone call to the Consulate. Mr. Alfonso's court appointed investigator, Mr. Amigo, testified that he interviewed Augustine Diaz-Morales, the owner of Danny's Mini Market in Tijuana. Mr. Amigo testified that Diaz-Morales told him that Mr. Alfonso came into the market, informed him that he was being threatened to cross the border with drugs, and called the Consulate from a phone. Diaz-Morales said the call lasted 25 minutes and that Mr. Alfonso was charged for the call. Thus, the jury already heard evidence corroborating Mr. Alfonso's phone call to the Consulate. The receipt Mr. Alfonso seeks to introduce is only cumulative and would not add any new evidence.

Thus, the evidence that Mr. Alfonso now wishes to offer post-trial was already available to him or could have been discovered with diligence before trial. Furthermore, Mr. Alfonso has not shown that this evidence will probably result in acquittal. Therefore, Mr. Alfonso's motion for a new trial to present new evidence [Docket No. 83] is **DENIED.**

Mr. Alfonso also seeks a subpoena for Jessica Huaracayo, a former employee of the U.S. Consulate in Tijuana, in order to offer her testimony to show that he called the Consulate. Mr. Alfonso further seeks to discover information Ms. Huaracayo may have concerning whether

1  the Consulate recorded any such conversations.  The Court has issued an order to the

2  Consulate to produce any such recordings, returnable June 1, 2009 [Docket N. 163].  Further

3  testimony by Ms. Huaracayo is not necessary for that inquiry.  Moreover, Mr. Alfonso was

4  aware of Ms. Huaracayo's existence and possible knowledge prior to trial.  He did not call her

5  as a witness then and his request to do so now is untimely.  Therefore, Mr. Alfonso's motion

6  for a subpoena for Jessica Huaracayo and to discover her address [Docket Nos. 142, 166, 168]

7  is **DENIED**.

8  Mr. Alfonso further moves the court to overturn the verdict and dismiss the indictment

9  based on vindictive or malicious prosecution.  Generally, the decision to institute federal

10 criminal proceedings is vested solely in the discretion of the United States Attorney and her

11 assistants.  "In our system, so long as the prosecutor has probable cause to believe that the

12 accused committed an offense defined by statute, the decision whether or not to prosecute,

13 and what charge to file . . . generally rests entirely in his discretion."  Bordenkircher v. Hayes,

14 434 U.S. 357, 364 (1978).  However, the Government may not institute prosecution based on

15 an intent to punish a defendant for exercising his constitutional rights.  Nunez v. Ramirez-

16 Palmer, 485 F.3d 432, 441 (9th Cir. 2007).

17 Here, Mr. Alfonso contends that the Government prosecuted him because of his prior

18 conviction for marijuana smuggling.  He alleges that, this time, he was coerced into smuggling

19 and would not have been prosecuted but for his prior conviction.  Mr. Alfonso's claim lacks

20 merit.  First, it is apparent that the Government agents did not believe his claim of duress.

21 Indeed, neither did the jury.  Second, basing prosecution on his prior record is not vindictive but

22 an entirely proper exercise of discretion.  Mr. Alfonso offers no evidence that his prosecution

23 was in retaliation for his exercise of a constitutional right or for any other improper reason.

24 Thus, his claim of vindictive or malicious prosecution fails on the merits and the Court **DENIES**

25 his motions to overturn the jury verdict due to vindictive or malicious prosecution [Docket Nos.

26 99, 122].

27 Mr. Alfonso additionally seeks a new trial based on a violation of his Fifth and Sixth

28 Amendment rights under Miranda v. Arizona, 384 U.S. 436 (1966).  One of Mr. Alfonso's prior

08cr2970

1  counsel made a pre-trial motion to suppress Mr. Alfonso's recorded post-arrest statements

2  [Docket No. 33].  Prior to trial, the Court scheduled a voluntariness hearing to determine the

3  admissibility of Mr. Alfonso's statement to Immigration and Customs Enforcement Agents Pena

4  and  Martell.  The defendant's statement was recorded on a DVD.  The hearing was held on

5  January 29, 2009, at which time Mr. Alfonso was exercising his right to represent himself.  Mr.

6  McCabe was present as advisory counsel at the hearing for Mr. Alfonso to consult with if he

7  wished.  At the hearing, the Court set up the DVD so that it could watch the recording in the

8  presence of the parties.  Mr. Alfonso interjected that "upon consideration we don't want to – we

9  don't want to watch it.  We want to include it."  He then withdrew his motion to suppress the

10  statement.  The Court advised the defendant of his right to a hearing under 18 U.S.C. § 3501.

11  Mr. Alfonso stated he understood his rights and wanted to withdraw his motion.  He stipulated

12  that proper <u>Miranda</u> warnings were given to him, that he knowingly, voluntarily, and intelligently

13  waived his <u>Miranda</u> rights, and that his statement to the agents was voluntary.  (<u>See</u> partial

14  transcript attached hereto.)  In a post-trial filing, Mr. Alfonso confirms that, "[f]urthermore, I tried

15  to help the Agents when I waived my right no[t] to speak with them (Fifth Amendment)." (Def.'s

16  Mot. to Overturn Verdict Due to Vindictive or Malicious Prosecution 2:26–28 [Docket No. 99,

17  122].)

18        During the trial, the Government called Agent William Pena as a witness.  Agent Pena

19  testified to the substance of his interview with Mr. Alfonso.  He related that Mr. Alfonso told him

20  that he had been beaten and forced to smuggle drugs.  Agent Pena testified that Mr. Alfonso

21  described the incident during which he was beaten by persons appearing to be members of the

22  Mexican Federal Police.  He related that Mr. Alfonso said that he called the U.S. Consulate and

23  gave them his vehicle description and license plate.  Mr. Alfonso told him that he had driven

24  across the border about a week and a half prior to his arrest and was waived through by the

25  officer.  He said that he returned to Mexico, was seized again, and was forced to drive the

26  present vehicle across the border.  Agent Pena said Mr. Alfonso told him that he tried to tell the

27  inspector at primary but there was too much noise and he was afraid the vehicle was bugged.

28

1    The Government did not play the DVD video of Mr. Alfonso's interview in its

2  presentation.  Mr. Alfonso, however, insisted that the entire video be played to the jury.  The

3  Court advised Mr. Alfonso that he was free to do so in his case in chief.  The Court asked Mr.

4  Alfonso, "In light of that, that he wants to play the whole video – without anything cut out?"  Mr.

5  Alfonso responded, "Yeah, without anything cut out."  (See partial transcript of February 3,

6  2009, attached hereto at 105–108.)

7    Mr. Alfonso then played the entire DVD of his interview for the jury in his case in chief.

8  The video began at about 4:41 pm with the taking of biographical information and Miranda

9  rights.  The actual substantive interview concerning the marijuana smuggling and duress

10  commenced at around 4:56 p.m.[2]

11    Mr. Alfonso now seeks to dismiss the indictment due to a violation of Miranda [Docket

12  121].  He contends that, at several points during the interview, he sought to invoke his right to

13  remain silent.  (See Def.'s Mot. to Dismiss Due to Miranda Warnings Violations 3–5 [Docket No.

14  121].)  While admission of a statement taken in violation of Miranda may be grounds for a new

15  trial, it does not merit dismissal of the indictment.  Nevertheless, construing the motion as one

16  for a new trial, it must be denied for several reasons.

17    First, Mr. Alfonso interrupted the Section 3501 hearing to say that he wanted the entire

18  interview played to the jury.  He stipulated to compliance with Miranda, his voluntary, knowing,

19  and intelligent waiver of his Miranda rights, and the voluntariness of his statement.  Indeed, Mr.

20  Alfonso apparently felt it was to his advantage to have the entire statement admitted.  Thus,

21  any claim of Miranda violation was waived by him.  If there was any error in the admission of

22  the statement, it was error invited by Mr. Alfonso and, therefore, is not a basis for a new trial.

23  United States v. Perez, 116 F.3d 840, 845 (9th Cir. 1997) (holding that where a defendant both

24  invites error and intentionally relinquishes a known right, the error is waived and unreviewable).

25    Second, Mr. Alfonso does not dispute that he initially waived his rights and made a

26  voluntary statement.  Thus, any statements he made following his initial waiver and before his

27

28    [2]    There is no transcript of the interview.  The times were noted by the Court in its
recent review of the video.  The statements are close but not always precise quotes.

08cr2970

alleged assertion of his right to silence were admissible. While agents must cease questioning when the defendant clearly indicates he wants to stop answering, Miranda, 384 U.S. at 473–474, the Supreme Court has not yet directly addressed ambiguous statements made in the context of the right to remain silent following an initial valid waiver. In Davis v. United States, 512 U.S. 452 (1994), the Supreme Court held that following an initial valid waiver of Miranda rights, only a clear and unambiguous invocation of the *right to counsel* will halt interrogation. Many state and federal courts have extended the Davis rule to require a suspect to unambiguously invoke the *right to remain silent* before police must cease questioning. See Deweaver v. Runnels, 556 F.3d 995, 1001 (9th Cir. 2009) (listing cases). Prior to Davis, the rule in the Ninth Circuit was that where a defendant makes a statement that is an equivocal assertion of the right to remain silent, the interrogating officer must then clarify the defendant's desire as to the exercise of the right to silence before continuing the interrogation. Nelson v. McCarthy, 637 F.2d 1291, 1296 (9th Cir. 1981). It is currently unsettled whether this rule survived Davis. See United States v. Shi, 525 F.3d 709, 729 (9th Cir. 2008); Deweaver, 556 F.3d at 1001. However, as the Ninth Circuit noted in Shi, "[A]t a minimum, such invocation must not be so equivocal or unclear that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking his right to remain silent." 525 F.3d at 729 (emphasis in original)(quoting Arnold v. Runnels, 421 F.3d 859, 866 (9th Cir. 2005) (internal quotations omitted)).

Nonetheless, even if the Ninth Circuit clarification rule survived Davis, the substantive bulk of Mr. Alfonso's statement took place prior to any of his alleged assertions of the right to remain silent. A fair analysis of the entire interview video shows that Mr. Alfonso tried to convince the agents to release him based on his claim of duress. While Mr. Alfonso attempted to secure his release, the agents tried to obtain more information from him. By the time that it became clear that the agents were not going to release him, Mr. Alfonso began to indicate that continuing to answer questions was useless to him.

While the substantive interview started at about 4:56 p.m., Mr. Alfonso does not claim a violation of his Miranda rights prior to about 5:07 p.m., eleven minutes into the interview. Mr.

10

Alfonso's statement at 5:07 p.m., "Why are we doing this if I can't even ask any questions?," does not even amount to an ambiguous assertion of the right to remain silent. At 5:14 p.m., Mr. Alfonso said, "If the embassy didn't work and you have to send me over there [jail], let's stop this." Agent Martell responded, "We can stop any time you want." Mr. Alfonso replied, "Well, yeah." At about 5:21 p.m., Mr. Alfonso told the agents, "Let's go see the judge." At about 5:26 p.m., Mr. Alfonso stated, "I don't know why we keep talking." Thereafter, at about 5:30 p.m., Mr. Alfonso said, "Just take me to M.C.C. and I'll deal with a judge." About two minutes later, Mr. Alfonso asked, "Why are we still talking?"

Mr. Alfonso's statement at 5:07 p.m. ("Why are we doing this if I can't even ask any questions?") is not even an equivocal assertion of the right to silence. It is not an invocation at all. Mr. Alfonso was trying to manipulate the agents while they were pressing him for information. Thus, the agents did not violate Mr. Alfonso's rights at 5:07 p.m. by continuing to ask questions. At 5:14 p.m., Mr. Alfonso indicated that if the agents were going to send him to jail, "Let's stop this." This was, at best, a conditional or equivocal invocation of the right to silence. Agent Martell responded to the effect that they could stop at any time Mr. Alfonso wanted to. Mr. Alfonso responded, "Well, yeah." This was at least an equivocal assertion of the right remain silent and, under pre-<u>Davis</u> Ninth Circuit law, the agents were required to clarify whether Mr. Alfonso wanted to actually stop the interrogation. At 5:21 p.m., 5:26 p.m., 5:30 p.m., and 5:32 p.m., Mr. Alfonso's statements to the agents that they should take him to jail and inquiries as to why they were still talking could also be viewed as equivocal invocations of the right to silence which the agents did not clarify. <u>See</u> <u>Anderson v. Terhune</u>, 516 F.3d 781, 787–788 (9th Cir. 2008).

However, the substance of the evidence offered by the government through Agent Pena was from Alfonso's statement to the agents before 5:14 p.m. Thus, its introduction was not error, even if the pre-<u>Davis</u> Ninth Circuit rule still applies. It was Mr. Alfonso who introduced the entire statement.

Third, any error in admission of the part of his interview after Mr. Alfonso may have indicated that he wished to stop answering questions was harmless beyond a reasonable

1   doubt.  Part of the interview was clearly admissible and the substance of the entire interview

2   was before the jury from Mr. Alfonso's own testimony in his defense.

3       Therefore, if there was any error in admitting part of the interview, it was waived by Mr.

4   Alfonso, it was not an error caused by the Government, and it was harmless.  The motion to

5   dismiss or for a new trial based on <u>Miranda</u> violations [Docket No. 121] is **DENIED**.

6       Mr. Alfonso also moves the Court to dismiss his indictment due to ineffective assistance

7   of counsel.  A new trial, rather than dismissal, is the appropriate remedy for ineffective

8   assistance of counsel.  Some of the brightest and most experienced criminal defense counsel

9   in this district were appointed to represent Mr. Alfonso.  He discharged each and every one of

10  them.  In total, the court appointed three attorneys and two advisory attorneys to represent and

11  assist Mr. Alfonso.  He discharged Michael McCabe, an exceedingly able and experienced

12  defense attorney, as his advisory counsel, midway through trial.  None of Mr. Alfonso's claims

13  of ineffective assistance of counsel merit a new trial because, ultimately, he chose to represent

14  himself.  Furthermore, nothing he alleges as ineffective assistance of counsel in any way

15  prejudiced his case. Mr. Alfonso was free to handle his case in the way that he wanted to.  Any

16  prior deficiencies of counsel, if there were any, could have been rectified by Mr. Alfonso when

17  he represented himself or if the Court had appointed another counsel at his request.

18  Therefore, the motion to dismiss due to ineffective assistance of counsel [Docket No. 125] is

19  **DENIED**.

20      Mr. Alfonso additionally seeks a new trial on the ground that, given his psychological

21  condition, the Court never should have allowed him to represent himself [Docket No. 156].  He

22  relies on the psychological evaluation by Dr. Judith Meyers filed under seal with Docket No.156.

23  Dr. Meyers's evaluation concludes that Mr. Alfonso is of average intelligence and that his

24  behavior is not "linked to a mental disorder."

25      The Court conducted an extensive hearing with Mr. Alfonso before approving his

26  demand to represent himself.  As a result, the Court concluded that he was competent and

27  capable to waive counsel and represent himself. (<u>See</u> January 12, 2009 Status Conference

28  [Docket No. 44].)  During trial, Mr. Alfonso made intelligent choices about the conduct of his

case and clearly understood the Court.   (See, e.g., conversation concerning a limiting instruction, February 3, 2009 hearing, partial transcript attached.)  Indeed, the Court noted to Mr. Alfonso that, while not a lawyer, he was, in fact "doing a pretty good job." (See attached partial transcript at 11.)

Dr. Meyers's report does not indicate that Mr. Alfonso was not competent to represent himself. Instead, it supports the Court's findings. Although Mr. Alfonso's experiences leading him to distrust others and engage in risky behavior may help explain his desire to represent himself, there is no basis to conclude that he was not competent to make the decision to do so. His motion for a new trial on this basis [Docket No. 156] is, therefore, **DENIED.**

Mr. Alfonso's motion for supplementation of the record [Docket No. 150] is **GRANTED**.

Mr. Alfonso's motion to continue the sentencing date [Docket 140] is **GRANTED**.  The Sentencing Hearing is hereby **CONTINUED** to **June 1, 2009 at 10:30 a.m.**

Mr. Alfonso's motion for copies of sealed documents [Docket Nos. 144, 146] is **GRANTED**.  The clerk has already provided these documents to the defendant.

Mr. Alfonso's motion for an extension of time [Docket No. 153] is **DENIED** as moot. Investigator Amigo filed the supplementation. The Court accepted the filing.

Defendant's motion for supplementation [Docket No. 160] is **GRANTED**.   The supplementation was received and filed as Docket No. 162.

The Court has read and considered all of Mr. Alfonso's post trial motions. ALL motions for dismissal and/or a new trial are **DENIED**.

**IT IS SO ORDERED.**

Dated: *May 27, 2009*

HONORABLE BARRY TED MOSKOWITZ
United States District Judge

Copy to:          Juan C. Alfonso, Reg. #91941-198
                  Metropolitan Correctional Center
                  808 Union Street
                  San Diego, CA 92101

1

```
 1   USA vs. Juan Carlos Alfonso
 2   08-cr-2970-btm
 3   January 29, 2009
 4   Motions hearing excerpt
 5                          *  *  *  *
 6        MR. MCCABE:  I think maybe we can short circuit the
 7   whole thing here, if Mr. Alfonso could address the Court.
 8        THE COURT:  Go ahead, sir.
 9        MR. ALFONSO:  Upon consideration, we don't want to --
10   we don't want to watch it.  We want to include it.
11        THE COURT:  In other words, you want to stipulate --
12        MR. ALFONSO:  We withdraw the motion.
13        THE COURT:  Withdraw the motion and stipulate to
14   the -- well, I don't know if the Government is going to use it.
15   If the Government offers it, you are saying you are going to
16   stipulate to its admission into evidence at the trial?
17        MR. ALFONSO:  Yes.
18        THE COURT:  Okay.  Now, if the Government doesn't
19   offer it, it is a hearsay statement and I don't know whether it
20   would come in or whether it is exception to the hearsay rule.
21   We'll have to worry about it if you are going to offer it.
22   That is a different question.
23        So the issue before the Court today is whether Miranda
24   warnings were validly given, whether you knowingly,
25   voluntarily, and intelligently waived the warnings and made a
```

1    statement and whether the statement was voluntary.  Do you

2    understand?

3            MR. ALFONSO:  Yes.

4            THE COURT:  It is the Government's burden to prove

11:40    5    that the Miranda warnings were -- were given, that they were

6    proper, that you know knowingly, voluntarily, and intelligently

7    waived your Miranda warnings, and you made a voluntary

8    statement.  The Government has to prove that by a preponderance

9    of the evidence.  Do you understand that?

11:40    10            MR. ALFONSO:  Yes.

11            THE COURT:  And you are entitled to a hearing in which

12    the Government would have to put on witnesses, and you have the

13    right to cross-examine, confront, question the witnesses.  You

14    could testify yourself.  You don't have to testify.  You have

11:40    15    the right to remain silent.  That couldn't be used against you

16    at all or be considered by the Court in ruling on the motion.

17    You also would have the right to call your own witnesses to

18    testify and subpoena them come into court to testify at this

19    hearing.  Do you understand that?

11:40    20            MR. ALFONSO:  Yes.

21            THE COURT:  So are you withdrawing the motion and

22    stipulating, that is, agreeing that the Miranda warnings given

23    were proper?

24            MR. ALFONSO:  Correct.

11:41    25            THE COURT:  And are you stipulating and agreeing that

1   you knowingly, voluntarily, and intelligently waived those

2   warnings?

3          MR. ALFONSO:  Yes.

4          THE COURT:  And are you stipulating and agreeing that

11:41   5   the statement that you made to Agent Pena and Agents Martel and

6   Flood was a voluntary statement by you?

7          MR. ALFONSO:  Yes.

8          THE COURT:  Do you wish that I ask anything further?

9          MR. GARDNER:  No.  I think that is sufficient.

11:41   10          THE COURT:  So in light of that the Government by

11   stipulation has met its burden under 3501 and the statement can

12   come into evidence.

13          MR. GARDNER:  Thank you, Your Honor.

14                      *  *  *  *

11:41   15

16   (court reporter:  Melinda Setterman, 619 937-5061)

17

18

19

20

21

22

23

24

25

1          (Excerpt February 3, 2009,

2          US vs. Alfonso, rough draft.)

3          THE COURT:  Okay.  I take it at this point you are

4    going to come to the statement?

5          MR. GARDNER:  Yes.                              12:04:56

6          THE COURT:  And is there anything in the statement

7    that shouldn't be in the statement?

8          MR.  GARDNER:  The way I am proposing to do it at

9    this point is to not discuss the video; to go through

10   specific questions, and I can get those out now, but the    12:05:10

11   basic areas are did Mr. Alfonso say that he was pressured --

12         THE COURT:  Are you going to bring out anything

13   about prior incidents?

14         MR. GARDNER:  Just the incident from a week to ten

15   days prior, but nothing about his 2004 conviction or anything  12:05:23

16   involving that.

17         THE COURT:  Okay.  So any problem?

18         THE DEFENDANT:  I would like to have the whole

19   video played.

20         THE COURT:  You are free to do that, in your case.   12:05:33

21         THE DEFENDANT:  Okay.

22         THE COURT:  In light of that, that he wants to play

23   the whole video -- without anything cut out?

24         THE DEFENDANT:  Yeah, without anything cut out.

25         THE COURT:  -- does that change your mind how you    12:05:48

1    want to do this?

2         MR. GARDNER:  I have no objection to it as long as

3    the record is clear that I am not offering the entire video,

4    because the court has ruled that I can't offer certain

5    portions of it under 609 at this point in the trial.          12:05:58

6         So as long as it's at Mr. Alfonso's insistence, if

7    he wants to play it, I am ecstatic to play the entire thing,

8    but I am not offering it at this point.

9         Now --

10        THE COURT:  Well, hold on.  Is there something on    12:06:11

11   the video about his prior conviction?

12        MR. GARDNER:  Yes, it comes out several times

13   throughout in different ways.  It's, I think -- I apologize,

14   I think I made an estimate that it is 35 or 40 minutes.  I

15   think it's more like 55 or 60 minutes.  I apologize.          12:06:28

16        THE COURT:  That's all right.  Everything is always

17   longer than you think except life.

18        MR. GARDNER:  His prior conviction comes up on

19   several occasions.  I think Officer Pena says to him, "You

20   have done this before, so you know how this works," something 12:06:46

21   along those lines, and then Officer -- I mean Mr. Alfonso

22   admits that he smuggled before.

23        I think Officer Pena even says, "I don't know how

24   much time you got last time, but this might be worse."

25        He also says at one point, I think -- Mr. Alfonso     12:07:00

1  says, "I wasn't getting paid this time.  I got paid before,

2  and I admitted to all of that freely, but this time, you

3  know, it's different because I'm not getting paid, I'm being

4  forced to do this," again incorporating his prior smuggling

5  venture.                                                12:07:21

6           THE COURT:  Do you want in evidence on the tape

7  recording that you have prior convictions for this?

8           THE DEFENDANT:  Yeah, because when I testify I'm

9  going to say -- I am going to have to say it anyway, so, yes.

10           THE COURT:  It appears to me I should give a      12:07:41

11  limiting instruction then saying the jury can only consider

12  this issue -- consider prior smuggling evidence on the issue

13  as to whether or not you were acting under duress and not for

14  any other reason.

15           MR. GARDNER:  I think that would be appropriate.  12:07:57

16           THE DEFENDANT:  Could you repeat that again.

17           THE COURT:  That I should instruct the jury that

18  the evidence they hear about prior smuggling instances can

19  only be considered on the issue of duress and not for any

20  other purpose.                                          12:08:10

21           THE DEFENDANT:  Correct.

22           MR. GARDNER:  I agree with that.

23           THE COURT:  I well hear the evidence first before I

24  give the instruction so I make sure it covers it.  So you

25  want to put into evidence the statements that you are making  12:08:21

| | |
|---|---|
| 1 | about you being convicted before and about that you might get |
| 2 | more time, et cetera? |
| 3 | THE DEFENDANT:  Say that again. |
| 4 | THE COURT:  You want all that in evidence? |
| 5 | THE DEFENDANT:  The video? |
| 6 | THE COURT:  Yes. |
| 7 | THE DEFENDANT:  Yes. |
| 8 | THE COURT:  You want every part of it in evidence. |
| 9 | THE DEFENDANT:  Yes. |
| 10 | THE COURT:  Okay.  And you are not offering that, |
| 11 | those parts? |
| 12 | MR. GARDNER:  No, but I would not -- no, I'm not, |
| 13 | but I have no objection if Mr. Alfonso wants it. |
| 14 | THE COURT:  You are going to ask the agent |
| 15 | questions, individual questions; correct? |
| 16 | MR. GARDNER:  Yes. |
| 17 | THE COURT:  And then what are you going to do?  Do |
| 18 | you want on cross examination to play the whole video, say, |
| 19 | "Is this the video?" |
| 20 | THE DEFENDANT:  I also want to ask him some |
| 21 | questions. |
| 22 | THE COURT:  Well, I mean, when is the video going |
| 23 | to be played, in your case or on cross examination? |
| 24 | THE DEFENDANT:  Can I have a minute? |
| 25 | THE COURT:  Right.  Those are your possibilities. |

12:08:37
12:08:43
12:08:55
12:09:04
12:09:18

6

```
1          THE COURT:  Okay.  Now, this is a draft of the

2    instruction I would give when the evidence comes out about

3    you having a prior smuggling conviction, and you also -- and

4    also talking about -- well, there is going to be evidence of

5    at least one prior smuggling conviction, that's the 2004.        14:19:19

6    Whether what occurred a week and a half before August 22nd

7    was smuggling or not, I don't know.  It's possible, yes.  So

8    I phrased it "on one or more occasions prior to August 22nd."

9          Now, there are two things at work here.  One is the

10   instruction that your prior conviction can only be used as      14:19:35

11   evidence on the issue of credibility, it can't be used as

12   evidence of guilt.  However, the underlying facts of the

13   prior conviction can be used as evidence on the issue -- only

14   on the issue of duress.  You were going to give me that case

15   so I could look at it again.                                    14:19:57

16          MR. GARDNER:  I have it here.  One moment.

17          THE COURT:  So this is what I propose giving them.

18   Now I have another alternative in the final instructions that

19   may relate to the specific dates of the incident, but I was

20   going to wait until I hear the testimony.                       14:20:10

21          MR. GARDNER:  I have the case.  It's United States

22   v. Verdugo.

23          THE COURT:  Verduzco.

24          MR. GARDNER:  Thank you.  373 F.3rd 1022.  Would

25   the court like a copy?                                          14:20:21
```

```
 1              THE COURT:  Do you have a non-marked-up copy?

 2              THE WITNESS:  No, it has my highlights on it.

 3              THE COURT:  It's 373 --

 4              MR. GARDNER:  373 F.3rd 1022.

 5              THE COURT:  I'll just get it from the books.  Okay.   14:20:37

 6  So why don't you take a look at this, and then tell me what

 7  you think.

 8              MR. GARDNER:  I think it's fine.  My only thought

 9  is that if his prior conviction comes in as 609 evidence, it

10  would also be admissible on the issue of his credibility.        14:20:53

11              THE COURT:  Right.  And I have an instruction.

12              MR. GARDNER:  A separate one related to that?

13              THE COURT:  Right.

14              MR. GARDNER:  Then I have no objection with this as

15  it stands now.                                                   14:21:04

16              THE COURT:  The interesting thing is there are two

17  parts of that.  There is the fact he was convicted of a

18  crime, that is on the issue of credibility, but the

19  underlying circumstances of that conviction --

20              MR. GARDNER:  Would be the 404(b) that would be     14:21:15

21  addressed by this.  That's right.

22              THE COURT:  So what do you think of this

23  instruction?

24              THE DEFENDANT:  I believe under 404(b) the crime

25  should be similar, and back then there was no duress or         14:21:28
```

8

1    coercion.  The drugs were in a hidden compartment; opposite

2    to this time, they were just on top of an engine.  So they

3    were not really hidden and there was no coercion or duress.

4           THE COURT:  The similarity, I understand your

5    point, but the similarity is the importation of drugs.          14:21:54

6    That's what the similarity is.  And it's close enough in

7    time, it's approximately four years before, and it relates to

8    a specific issue, that is, whether there was coercion and

9    whether you could have come up with another way of dealing

10   with it rather than just smuggling the drugs.  So I think it   14:22:20

11   goes to the duress defense.

12          THE DEFENDANT:  Can I have a moment?

13          THE COURT:  Sure.  But isn't this in the tape

14   recording anyway you're playing to the jury about his prior

15   conviction?                                                    14:22:38

16          MR. GARDNER:  It is.

17          THE COURT:  Mr. Gardner hasn't brought it up, but

18   you're bringing it out.

19          THE DEFENDANT:  You mean to tell me that if we

20   don't play that he's not going to bring it up?                 14:22:50

21          THE COURT:  He's probably going to bring it up on

22   cross-examining you.

23          MR. GARDNER:  I definitely will.

24          THE DEFENDANT:  Then we'll play it.

25          THE COURT:  You know, as Mr. McCabe is probably         14:23:00

9

1   about to tell you, if you jump the gun and bring it up first,

2   you are not going to be able to argue an error if Mr. Gardner

3   brings it out because you will have opened the door, you will

4   have brought it up.

5          Do you understand?                                    14:23:15

6          THE DEFENDANT:  But I can argue it if he brings it

7   up and I haven't played it?

8          THE COURT:  You can argue that it was an error in

9   me allowing it, yes.  But if you bring it up first then it

10  can't be an error in me allowing it because you put it on.   14:23:26

11         THE DEFENDANT:  May I have a minute, please?

12      (Discussion between defendant and Mr. McCabe.

13             and Mr. Amigo off the record.)

14         THE COURT:  I'll be right back.

15         MR. GARDNER:  Your Honor, may I step out for just a   14:23:47

16  moment as well?  Thank you.

17         THE COURT:  Sure.  What's good for the goose...

18         MR. GARDNER:  I appreciate it.

19                  (Brief recess.)

20         MR. GARDNER:  Are we on the record, your Honor?       14:26:58

21         THE COURT:  We are now.  We were waiting for you to

22  come back.

23         MR. GARDNER:  I apologize.

24         THE COURT:  I just came back in and was reading the

25  Verduzco case.                                               14:27:09

1          MR. GARDNER:  Thank you.  Just, I think this is not

2    any more than an odd note, that the same juror we were

3    discussing earlier just passed me in the hallway and asked if

4    it was time to come back in and I said, "Not yet."  Anyway...

5          THE COURT:  All right.  Okay.  So do you think I'm      14:27:22

6    right, Mr. McCabe, about that if the defense brings up an

7    issue first, then if the government brings it up later they

8    can't argue it as error?

9          MR. MCCABE:  Yes, your Honor, I believe that's

10   right, but I don't believe it's going to be looked upon as     14:27:40

11   error anyway.

12         THE COURT:  You say that about all my rulings.

13         MR. MCCABE:  No, I don't.

14         THE COURT:  That was supposed to be humor.

15         MR. MCCABE:  Yes, I understand that.                     14:27:53

16         THE COURT:  Well, okay.  In the case that I was

17   thinking of, and I think it was a Supreme Court case, I'm

18   going by memory, but I thought it was where the defendant

19   brings out his prior record in his direct testimony when he

20   takes the stand --                                            14:28:14

21         MR. MCCABE:  He can't complain about error in the

22   admission of the priors.

23         THE COURT:  Right.

24         MR. MCCABE:  Yes, that's my understanding as well,

25   and I believe that the same principle would apply to the      14:28:25

1   situation that you are talking about.

2          THE COURT:  I just wanted Mr. Alfonso to be aware

3   of that.

4          MR. MCCABE:  I understand that.

5          THE COURT:  Okay.  Although you're not a lawyer,      14:28:35

6   and you are doing a pretty good job, I must admit, still

7   there are certain things, like I said, that you are unaware

8   of consequences that occur when you raise something or don't

9   raise something vis-a-vis appeal, if you were to be found

10  guilty.  That's one of the pitfalls of not being a lawyer and  14:28:54

11  representing yourself, you are unaware of all those things.

12  A lot of lawyers aren't aware of all these things.  Okay?

13         THE DEFENDANT:  Yes.

14         THE COURT:  So we are ready to proceed.  Any

15  objection to the limiting instruction?                       14:29:11

16         THE DEFENDANT:  Your Honor --

17         MR. GARDNER:  Not from the government.

18         THE DEFENDANT:  Your Honor, we need to look at the

19  phone one more time.

20         THE COURT:  Could you have him come in with the       14:29:18

21  phone.

22         MR. GARDNER:  I think Agent Pena just stepped out.

23  I'll go get him.

24         THE COURT:  But to make it clear, you have no

25  objection to the limiting instruction?  We'll wait for Mr.   14:29:28

1    Gardner to come back.

2           MR. GARDNER:  Your Honor, Agent Pena is here and we

3    can show the phone.

4           THE COURT:  Okay.  Do you have the phone?  Do you

5    have any objection to the instruction?                        14:30:07

6           THE DEFENDANT:  No, your Honor.

7           THE COURT:  I think, even if you raise it first,

8    you're still entitled to a limiting instruction.

9           MR. GARDNER:  Just for the record, your Honor, Mr.

10   Alfonso is scrolling through the phone.  Mr. Amigo and Mr.    14:32:33

11   Pena are observing as best they can also what the cell phone

12   is doing, I would just note for the record.

13          THE COURT:  Do you have any objection to Agent Pena

14   being there?

15          THE DEFENDANT:  No, not at all.                        14:32:49

16          THE COURT:  Okay.

17          MR. AMIGO:  Your Honor, Mr. Alfonso has instructed

18   me to do something right now.  If I need something faxed is

19   there a way to get a fax number for the court so I can get it

20   here or should I do it --                                     14:33:59

21          THE COURT:  What do you need faxed?

22          MR. AMIGO:  We are looking for a receipt that the

23   company has found and we are going to need it to present as

24   evidence.

25          THE COURT:  I don't see any reason why it can't be     14:34:11

13

1    fax'ed to the court's fax number.  The clerk can give it to

2    you.

3            MR. AMIGO:  This way I can get it immediately.

4            THE COURT:  It should be to your attention.

5            MR. AMIGO:  Yes, sir.                          14:34:20

6            THE COURT:  She can give you the fax number.  All I

7    can tell you is it's 619.

8            MR. AMIGO:  I'm sorry?

9            THE COURT:  I can tell you it's 619, probably 557

10   something, but maybe not.  You can ask Dawn.  Just call her   14:34:37

11   and ask her.  You can fax it to chambers and then my

12   secretary will bring it into the courtroom and give it to Mr.

13   Amigo.

14           MR. AMIGO:  Then I will wait to leave until I get

15   the number.                                           14:35:22

16           THE CLERK:  The fax is 619-702-9966.

17           MR. AMIGO:  619-702-9966?

18           THE CLERK:  Yes.

19           MR. AMIGO:  I will just have him put "Attention

20   Alejandro Amigo."                                      14:35:37

21           THE CLERK:  I'll let Dawn know.

22           THE DEFENDANT:  Your Honor, is it possible to ask

23   Mr. Gardner for the DVD of my post-arrest?

24           MR. GARDNER:  I have it here.  I can hand it over

25   now.                                                  14:36:36

```
 1            THE COURT:  All right.

 2            MR. MCCABE:  We don't have any admitted into

 3    evidence yet or even marked, do we?  All right.

 4            THE COURT:  Okay.  You are still going to play --

 5    in your case you are going to play the entire DVD?  Is that     14:37:31

 6    your intention?

 7            THE DEFENDANT:  Yes, your Honor.

 8            THE COURT:  Okay.

 9            MR. GARDNER:  No objection.  The government is

10    ready to proceed whenever.                                      14:37:42

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```